UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

      MORRIS SEARS d/b/a ABBA BONDING,

          Debtor.                       Case No.: 09-11053-MAM-11

      UNITED STATES OF AMERICA,

          Plaintiff,

      v.                              Adv. Proc. No.: 09-01070

      MORRIS SEARS d/b/a ABBA BONDING,

          Defendant.

### ORDER DECLARING DEBT TO NATIONAL PARK SERVICE NONDISCHARGEABLE AND DECLARING CERTAIN BOND PREMIUMS NONDISCHARGEABLE

Charles Baer, Attorney for the United States, Mobile, Alabama
Kenneth A. Watson, Attorney for the Debtor, Mobile, Alabama

    This case is before the Court on the United Statescomplaint to determine the dischargeability of debts owed to the United States by the Debtor. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. The Court has the authority to enter a final order pursuant to 28 U.S.C. § 157(b)(2). For the reasons indicated below, the United States' requested relief is due to be GRANTED as to the National Park Service's claimand certain bond premiums and otherwise DENIED.

## FACTS

Debtor Morris Sears ("Debtor") filed for Chapter 11 bankruptcy protection on March 5, 2009. On July 8, 2009, the United States filed an adversary proceeding seeking a determination of nondischargeability as to its losses stemming from the Debtor's alleged fraud.

The United States bases its request for relief on a string of bond surety agreements that the Debtor entered into between October of 2005 and November of 2008. Specifically, the Debtor acted as surety for numerous government agencies by issuing payment, performance, and bid bonds. In connection with every bond issued, the Debtor submitted an Affidavit of Individual Surety ("Affidavit" or, collectively "Affidavits") in which he pledged collateral to secure the bonds. The Affidavits included the following statement: "This affidavit is made to induce the United States of America to accept me as surety on the attached bond." The Debtor's signature, asattested to by a notary, is affixed to almost every Affidavit offered by the United States.Included with his signature is a stamp from ABBA Bonding Company. The Debtor did business as ABBA Bonding.

In connection with each of the bonds, the Debtor pledged at least one of the followingparcels of property: (1) a parcel of property located at 34146 N. Ickler Avenue, Lillian, Alabama, (2) lots 5, 6, 7, and 8 Rosalia Avenue, Lillian, Alabama, (3) a property in Granbury, Texas, and (4) one parcel in Baton Rouge, Louisiana. The Debtor specifically testified in a deposition on February 29, 2008 that he pledged the Lillian, Alabama and Granbury, Texas properties to support bond issuances.The Debtor included valuations of the properties in the Affidavits and stated that he owned them with clear title. He represented that the pledged real property was unencumbered by mortgages, liens, and judgments. He also swore in each Affidavit

that none of the real property being pledged had been pledged to any other bonds within three years prior to the execution of the Affidavit.

The United States presented evidence indicating that many of the representations in the Affidavits were untrue. First, all of the properties were pledged more than once as security for the Debtor's various bond issuances. Despite that, the Debtor repeatedly represented that the real property had not been pledged to any other bonds. Second, the Debtor did not own all of the real property pledged, specifically the Granbury, Texas property and the Baton Rouge property. The Debtor confirmed at his 341 meeting that he had no interest in either property. Third, the Debtor did not own all of the real property with clear title. The evidence shows that the Debtor's wife held a joint interest in the Lillian, Alabama properties at all times and that the Debtor mortgaged his interest in those properties to his wife on July 1, 2007. The mortgage remained on the land records until 2009. Further, a $1,492,872 judgment was recorded in the Baldwin County Probate Court on March 26, 2008 which affected the Lillian, Alabama property. Other than the real property, the Debtor made other misrepresentations in the Affidavits. The Debtor repeatedly stated that his bonding business, ABBA Bonding, had a net worth of $126,195,665.61. The Debtor admitted at his 341 meeting that ABBA Bonding was never worth that much.

The United States submitted deposition testimony from seven different contracting officers responsible for reviewing, receiving, and approving several of the Debtor's bond surety agreements. Those contracting officers testified regarding eleven different contracts where bonds were issued by the Debtor: (1) GSA (General Services Administration) contracting officer Tracy Maes testified with regard to contracts GS-08P-06-JBC-3042, GS-08P-06-JBC-3077, and GS-08P-07-JB-P-0024; (2) GSA contracting officer Barbara Marthe testified in regard to contracts GS-08P-07-P-0096 and GS-08P-08-JB-0008; (3) National Park Service contracting officer Jim

Case 09-01070    Doc 116    Filed 02/16/12    Entered 02/16/12 13:09:46    Desc Main
Document        Page 3 of 23

Read testified regarding contract N/C8380060031; (4) National Park Service contracting officer Sheri Slavens testified about contract P8750070323; (5) National Park Service contracting officer Tammy Gallegos testified regarding contract number N/C1274070054; (6) Department of Veterans Affairs contracting officer Crystal Dobbins testified as to contract number VA-263-08-1B-0137; and (7) Carole Bryant, a National Park Service contracting officer, testified about contract number C7220080004. The contracting officers all testified that they relied upon the Affidavits in ultimately choosing to use the Debtor as surety. The remaining bonds offered into evidence by the United States were not accompanied by any testimony. Only the bonds were presented as evidence.

The Debtor charged a commission of four percent on the bonds he issued. In general, the Debtor would receive the four percent commission charge directly from the contractors, and then the contractors would bill the United States for that amount in connection with the remainder of the contract. The United States only presented evidence that three bond premiums were actually paid: (1) Tracy Maes testified that the bond premium associated with GSA contract GS-08P-06-JBC-3077 was paid, (2) Barbara Marthe testified that the bond premium for GSA contract 08P-08-JB-0008 was paid, and (3) Tammy Gallegos testified that in NPS contract N/C1274070054 that the Debtor was paid $126,887.19 from the contractor as a bond premium. The evidence indicates that the Debtor investigated, paid, attempted to pay, and/or defended many of the claims made pursuant to his bond issuances.

The NPS filed a $1,055,724.10 proof of claim in the Debtor's bankruptcy case for default on contract bonds. The proof of claim is in reference to NPS contract N/C1274070054, relating to an agreement with Diamante Contractors, Inc. to construct housing units at Big Bend National Park in Texas in exchange for $2,985,581 (the "Big Bend Phase II project"). The Debtor served

4

as surety on the project and issued performance and payment bonds. Ultimately, Diamante was unable to complete the job as specified in the contract. In February of 2008, the Debtor investigated the claim and determined that Diamante was guilty of job mismanagement, including not paying subcontractors, and suggested to NPS that Diamante should be defaulted. He also suggested, pursuant to his obligations under the bonds, that he would submit an alternate contractor to finish the job and that he would attempt to settle with unpaid subcontractors. Roughly a year later, in January of 2010, NPS put Diamante in default. By that time, the Debtor was in bankruptcy, having filed on March 5, 2009. Tammy Gallegos testified that NPS could not collect under the bond issued by the Debtor due to the bankruptcy. As a result, NPS was required to hire another contractor to finish the job. The United States now seeks, through its proof of claim, all costs associated with finishing the job from the Debtor for default on his contract bonds.

The parties submitted trial briefs and responses, along with accompanying exhibits. The Debtor submitted a brief objecting to many of the United States' evidentiary exhibits and the United States submitted a response. Accordingly, no witnesses were examined before the Court.

The Court indicated, at a hearing prior to the trial testimony being presented, that it would not hear evidence regarding the amount of damages to be awarded to the United States, if any, as a part of this trial. Any award of damages would be dealt with at a later time, by this court or another federal court (if the United States files suit for debts this court declares to be nondischargeable).

## LAW

### I. Evidentiary Rulings

The Debtor posed objections to several of the United States' exhibits. Those objections will be addressed in the order presented by the Debtor:

1.  United States Exhibit 1: This objection is regarding a performance and payment bond for government contract number 43000047187. It is overruled. The bonds are signed by the Debtor and bear the seal of his d/b/a Abba Bonding. These bonds were offered to show fraudulent intent and are clearly relevant pursuant to Federal Rule of Evidence 401 as they tend to make a fact or consequence more or less probable. This relevance is not outweighed by potential unfair prejudice. The bonds are not hearsay because they are signed by the Debtor and qualify as admissions under FRE 801(d)(2). Finally, no rule of evidence or procedure requires that the full extent of a party's exhibits be disclosed in its complaint. Further, in its amended complaint, the United States left open the possibility that additional bonds might be discovered.

2.  United States Exhibit 2: This is a Complaint in a District Court lawsuit against the Debtor. The objection is overruled. This Complaint is offered to make the United States' Exhibit 3, the Answer to the Complaint, understandable. Therefore, it is relevant. Further, it is not offered for the truth of the matters asserted and not hearsay.

3.  United States Exhibit 3: This is the Answer to the Complaint referred to in ruling 2, immediately above. The Debtor objects to this exhibit on the grounds of relevance and hearsay. The Debtor's objections are overruled. This exhibit is relevant because it serves as additional evidence of fraudulent intent. It is not hearsay because it is an admission under FRE 801(d)(2).

4.  United States Exhibit 6: This objection is overruled. See reasoning in ruling 1, *supra*.

5.      United States Exhibit 7: This objection is overruled. See reasoning in ruling 1, *supra*.

6.      United States Exhibit 8: This objection is overruled. See reasoning in ruling 1, *supra*.

7.      United States Exhibit 13: This objection is overruled. See reasoning in ruling 1, *supra*.

8.      United States Exhibit 15: This objection is overruled. See reasoning in ruling 1, *supra*.

9.      United States Exhibit 16: This objection is overruled. See reasoning in ruling 1, *supra*.

10.      United States Exhibit 17: This objection is overruled. See reasoning in ruling 1, *supra*.

11.      United States Exhibit 18: This objection is overruled. See reasoning in ruling 1, *supra*.

12.      United States Exhibit 19: This objection is overruled. It appears that the Debtor admitted in his February 10, 2011 responses to the United States' Request for Admissions that Exhibit 19 was a performance and payment bond for contract C1274070054 issued by the Debtor d/b/a Abba Bonding, with an attached Affidavit of Surety. This is sufficient to authenticate the documents. The bonds in Exhibit 19 are relevant to proving fraudulent intent and loss to the United States, facts of consequence in this adversary proceeding.

13.      United States Exhibit 21: This objection is overruled. See reasoning in ruling 1, *supra*.

14.     United States Exhibit 25: This objection is overruled. Exhibit 25 is the warranty deed granting joint ownership of the Debtor's Lillian, Alabama properties to the Debtor and his wife. This document is relevant because it serves as evidence that the Debtor's representations that he owned the properties listed in the Affidavits of Individual Surety "with clear title" were untrue.

15.     United States Exhibit 26: This objection is overruled. Exhibit 26 is a copy of a mortgage agreement between the Debtor and his wife executed and recorded in July of 2007. Like Exhibit 25, it tends to show that the Debtor did not own the properties detailed in the Affidavits of Individual Surety with clear title as he represented. Therefore, it is relevant.

16.     United States Exhibit 27: This is a cancellation of the mortgage detailed in Exhibit 26. It is relevant because it shows that the mortgage was recorded until February of 2009, thus clouding the title on the properties and tending to refute the Debtor's statement that he owned the properties "with clear title."

17.     United States Exhibit 28: This objection is overruled. This is the death certificate of the Debtor's late wife, Joann Sears. The United States offered this piece of evidence to show that the Debtor's wife passed away prior to the release of the mortgage detailed in Exhibit's 26 and 27. While less probative than the previous two Exhibits, it is relevant to cast suspicion on the release of the mortgage. The Debtor suffers no unfair prejudice from its admittance.

18.     United States Exhibit 30: This objection is overruled. This exhibit tends to show that the Debtor provided false information in support of one of his bond issuances. It is relevant because it highlights inconsistencies in the Debtor's prior testimony regarding whether he filed a 2006 tax return. The Debtor's tendency to tell the truth is always relevant.

19.     United States Exhibit 32: This objection is overruled. Exhibit 32 is a recorded judgment in Baldwin County Probate Court for $1,492,872. It is relevant to show that the Debtor misrepresented the state of the title of his Lillian, Alabama properties.

20.     United States Exhibit 33: This objection is overruled. The deposition testimony of the Debtor acts as an admission and is not hearsay. FRE 801(d)(2). It is relevant because his testimony sheds light on the veracity of the representations he made in the Affidavits of Individual Surety.

21.     United States Exhibit 35: This objection is overruled in part and sustained in part. Exhibit 35 is a Bid Bond Request form and an Affidavit of Individual Surety regarding the Bid Bond. In the Affidavit, the Debtor answers the question of whether he pledged the property detailed in the Affidavit to other bonds within the 3 years prior to execution. The Debtor answers that question by providing a numerical value. The United States offered this exhibit to show that the Debtor understood the question in the Affidavit of Individual Surety since he answered "0" on most of the other Affidavits he executed. This exhibit is relevant for that purpose. The Affidavit is not hearsay because it is an admission by the Debtor. The "Bid Bond Request form" is hearsay. It is an out-of-court statement offered for the truth of the matter asserted. The business record exception does not apply to it because the proper foundation has not been developed. It will not be considered by the Court.

22.     United States Exhibit 36: This objection is sustained. This Affidavit is relevant as it tends to speak to the Debtor's fraudulent intent with regard to representations made in Affidavits of Individual Surety. However, it has not been authenticated. The Trustee cannot serve to authenticate a business record when she has no personal knowledge of the Debtor's

recordkeeping practices. *In re Samy Santa Flooring Depot, Inc.*, No. 09–6571, 2011 WL 873440, at *3 (Bankr. N.D. Ga. March 14, 2011). The Court will not consider it.

23.     United States Exhibit 37:This objection is sustained. This Exhibit has not been properly authenticated. See reasoning immediately above in ruling 22 as to Exhibit 36.

24.     United States Exhibit 38: This objection is sustained. This Exhibit has not been properly authenticated.  See reasoning immediately above in ruling 22 as to Exhibit 36.

25.     United States Exhibit 40: The United States withdrew this exhibit in its response. Therefore, the Court will not admit or consider it.

26.     United States Exhibit 41: This objection is overruled. The deposition testimony of the Debtor acts as an admission and is not hearsay. It is relevant because his testimony sheds light on the veracity of the representations he made in the Affidavits of Individual Surety.

27.     United States Exhibit 42: This objection is overruled. This is a performance bond issued by Abba Bonding, Inc. It includes the Debtor's signature and the seal of ABBA Bonding. It is not hearsay because it is an admission. FRE 801(d)(2). It is relevant because it speaks to the credibility of the Debtor. The United States offered this piece of evidence to contradict prior testimony of the Debtor. It is relevant for that purpose. Its probative value is not substantially outweighed by unfair prejudice. The Debtor had an opportunity to refute this Exhibit.

28.     United States Exhibit 43: This objection is overruled. See the reasoning immediately above in ruling 27 as to Exhibit 42.

29.     United States Exhibit 44: This objection is overruled. See the reasoning above in ruling 27 as to Exhibit 42.

30.     United States Exhibits 46 – 49: This objection is sustained. These are copies of Cease and Desist Orders issued by the state of Alabama, Florida, and Colorado to the Debtor and

Case 09-01070    Doc 116    Filed 02/16/12    Entered 02/16/12 13:09:46    Desc Main
Document      Page 10 of 23

his business ABBA Bonding for conducting business without state licensure. As domestic public documents filed under seal, they are self-authenticating. FRE 902(1). The Exhibits are excepted from the hearsay rule as public records pursuant to FRE 803(8). The United States offers these Orders to show the Debtor's "propensity to make false sworn statements and that his false statements were intentional acts, not mistakes." However, the Court is not convinced that evidence showing that the Debtor operated without business licenses adds anything to the discussion as to whether the Debtor made false statements on Affidavits in this case. Further, it is impermissible to use the fact that the Debtor operated without a business license as a former bad act to show that he intentionally made false statements in the Affidavits associated with his bond issuances or to show that he has bad character. FRE 404(b)(1); 404(a).

31. United States Exhibit 50:This objection is sustained. Exhibit 50 is a copy of a Maryland state court order finding, in part, that the Debtor and his wife breached their surety bond obligations and were guilty of statutory insurance fraud and common law fraudulent concealment and inducement. The United States offers it to show that the Debtor previously committed fraud and that this Court previously relied on it in deeming a debt nondischargeable in a separate adversary proceeding involving the Debtor. A nondischargeability finding by this Court regarding a debt deriving from a state court judgment of fraud is not akin to this Court finding that the misrepresentations made by the Debtor in this case were likewise fraudulent. The Maryland judgment adds very little to the discussion in terms of probative value. Its probative value is substantially outweighed by the unfair prejudice that would accord an inference that because the Debtor was found guilty of fraud elsewhere that he committed fraud here. FRE 403; 404(b). The Court will not admit or consider it.

32.     United States Exhibit 60: This objection is overruled. Exhibit 60 is the deposition of Barbara Marthe, not Jim Read. Jim Read's deposition is Exhibit 61. Jim Read's deposition is relevant because it explains his reliance, as a contracting officer, on bonds issued to the National Park Service by the Debtor. Reliance is an issue of consequence in this case. The fact that the bonds were not specifically included in the United States' amended complaint does not detract from the probative value of Jim Read's testimony regarding his interactions with the Debtor regarding surety bonds as a contracting officer for the National Park Service.

33.     The Debtor also objects to the Trustee's ability to authenticate documents. This objection is sustained. The United States filed a Certificate of Authenticity which was executed by the Trustee. In it, the Trustee testified that certain documents were "copies of records from the bankruptcy estate of Morris Sears" and that they were in her custody as a part of the regular course of business of the Trustee. The Trustee's statements are true. However, having documents in her possession that were filed in conjunction with the bankruptcy case does not serve to authenticate those documents under the Federal Rules of Evidence. It merely states that the Trustee has them and that they were given to her. Those six documents will not be considered by the Court because they are not authentic.

## II. Dischargeability Analysis

The United States seeks a determination of nondischargeability. "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, and recognize that the reasons for denying a discharge…must be real and substantial, not merely technical and conjectural." *In re Miller*, 39 F.3d 301, 304 (11th Cir.1994). The United States seeks relief pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). The Court will address the sections independently.

Case 09-01070    Doc 116    Filed 02/16/12    Entered 02/16/12 13:09:46    Desc Main
Document      Page 12 of 23

**523(a)(2)(A)**

Section 523(a)(2)(A) states that a particular debt may be precluded from discharge if it is a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud." It is not necessary for a debtor to directly obtain money or property from a creditor in order to invoke § 523(a)(2)(A). Rather, it is only necessary that the Debtor receive a benefit as a result of his fraudulent means. *In re Bilzerian*, 100 F.3d 886, 889-90 (11th Cir. 1996). In order to succeed under § 523(a)(2)(A), the United States must prove the following elements by a preponderance of the evidence: (1) the debtor made a false representation with the intent to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998); *In re Garrett*, 2011 WL 3586178, at *2 (S.D. Ala. August 16, 2011).

**A.**

For a debt to be nondischargeable pursuant to § 523(a)(2)(A), the Debtor must have made a false representation with the intent deceive the creditor. *Bilzerian*, 153 F.3d at 1281. "Intent is a subjective issue requiring the Court to examine the totality of the circumstances." *In re Dennis*, 444 B.R. 210, 216 (Bankr. N.D. Ala. 2011). Indeed, the Debtor's intent to deceive the United States can be inferred from the volume and pattern of his misrepresentations. *In re Firestone*, 26 B.R. 706, 717 (Bankr. S.D. Fla. 1982); *In re Dennis*, 444 B.R. at 216. It is not necessary to prove that the Debtor intended to cause the United States losses. *In re Spicer*, 155 B.R. 795, 802 (Bankr. D. Col. 1993). Rather, all that is required is a showing of intent to induce the creditor to rely on misrepresentations made by the debtor in question. *In re Reuter*, 427 B.R. 727, 753 (Bankr. W.D. Mo. 2010).

The Court finds that the Debtor made false representations with the intent to deceive the United States. The Debtor made numerous representations within the Affidavits that he executed and submitted, under oath, to the United States. It is clear that many of representations were false and that the Debtor knew that the representations were false.The Debtor knew that he was pledging the same properties as bond collateral multiple times, and yet he patently denied doing so on each Affidavit. The fact that several of those Affidavits were executed within days or months of one another further highlights his knowledge. In addition, the Debtor repeatedly pledged property he did not own in support of his surety bonds. He also consistently misrepresented the state of the title of the properties he submitted as collateral. He knew that his wife jointly owned his Lillian, Alabama properties. Likewise, his knowledge that he mortgaged the Alabama properties is equally apparent.

Moreover, the Debtor made those false statements in order to induce the United States to accept him as a surety. The Debtor executed many Affidavits containing false information. The Affidavits specifically recite that they were "made to induce the United States to accept me as a surety on the attached bond." It is clear, based on the sheer number of times that the Debtor executed false Affidavits that his misstatements were not the result of mistake. Instead, the Debtor wanted to be approved as a surety so that he could reap the benefits associated with that approval. The misrepresentations in the Affidavits were calculated to achieve that goal. His pattern of knowing misrepresentations demonstrates his intent to deceive.

Further, the fact that the Debtor investigated and paid some of the claims made pursuant to the bond agreements does not absolve his fraudulent intent. *In re Moore*, 277 B.R. 141, 150 (Bankr. M.D. Ga. 2002). The Debtor made fraudulent misrepresentations in attaining the approval of the United States to serve as a surety. Acting according to the attendant obligations

of that approval *after the fact* does not alter the Debtor's initial intent to deceive. The Debtor's misrepresentations were not about whether he intended to perform. Rather, they were regarding his qualifications to be a surety. If the Debtor had cured or attempted to cure his qualification misrepresentations after the fact, then that *might* speak more directly to his fraudulent intent under the facts of this case. However, performing under fraudulently obtained surety agreements does not alter the fact that they were fraudulently obtained in the first place.

**B.**

It is not enough that the Debtor made misrepresentations with the intent to deceive. To be excepted from discharge pursuant to § 523(a)(2)(A), the United States must have relied on the Debtor's representations. *Bilzerian*, 153 F.3d at 1281. As the United States bears the burden of proof by a preponderance of the evidence as to all required elements, some evidence of reliance on the Debtor's misrepresentations must be shown as to every bond that serves as the basis for its alleged loss.

Here, the United States presents the Court with a group of payment, performance, and bid bonds issued by the Debtor acting as surety for numerous government contracts. Of those contracts, eleven are accompanied by corroborating evidence as to the United States' reliance, through its agencies' contracting officers, upon the Debtor's representations in the Affidavits.[1] Those contracting officers confirmed that they relied upon the information in the Debtor's Affidavits. Thus, only those bonds satisfy the reliance requirement, and only those bonds should be considered with regard to dischargeability. The United States has failed to meet its burden of proof with regard to the other bonds.

---

[1]As detailed in the facts above, the government contracts that included supporting testimony are: (1) GSA contracts GS-08P-06-JBC-3042, GS-08P-06-JBC-3077, GS-08P-07-JB-P-0024, GS-08P-07-P-0096, and GS-08P-08-JB-0008; (2) National Park Service contracts N/C8380060031, P8750070323, N/C1274070054, and C7220080004; and (3) Department of Veterans Affairs contract number VA-263-08-1B-0137.

**C.**

The United States must show that its reliance was justifiable. *In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995); *Field v. Mans*, 516 U.S. 59 (1995). Justifiable reliance is a lesser standard than the customary reasonable reliance standard. *In re Hall*, 342 B.R. 653, 656 n.6 (Bankr. M.D. Fla. 2006). The Eleventh Circuit, in adopting the justifiable reliance standard, stated the following:

> To constitute justifiable reliance, "[t]he plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility."…Justifiable reliance is gauged by "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Additionally, "[i]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."

*In re Vann*, 67 F.3d at 283 (internal citations omitted).

In this case, the Court finds that the United States' reliance on the Debtor's misrepresentations was justifiable. The information contained in the Affidavits was submitted under oath, as attested to by a notary. The contracting officers who testified that they relied on the Affidavits explained that it was important to them that each Affidavit was properly completed, was signed under oath, and included the appropriate seals. It is true that in virtually every case the contracting officers could have investigated and discovered that the information contained in the Affidavits was false. However, the justifiable reliance standard only requires investigation when the falsity of the information presented is obvious to the individual reviewing it. The contracting officers had every reason to believe that a completely filled out Affidavit containing the requisite information and signed by the affiant, as attested to by a notary, was

legitimate. The misrepresentations were not apparent to the contracting officers. Justifiable reliance does not require investigation under the facts of this case. Also, the contracting officers looked at numerous bonds. They would not necessarily remember what was stated in any other bond of the Debtor that they reviewed at a different time.

**D.**

To succeed under § 523(a)(2)(A), it is necessary for the United States to demonstrate a loss of property resulting from the Debtor's fraudulent misrepresentations. *Bilzerian*, 153 F.3d at 1281; *In re Rountree*, 330 B.R. 166, 171-72 (E.D. Va. 2004). The United States' burden of proof is by a preponderance of the evidence. *Id*. The United States cites two sources to demonstrate its losses.

**1.**

First, the United States points to the $1,055,724.10 proof of claim made by the National Park Service regarding the Big Bend Phase II project. The United States asserts that the claim represents the losses that NPS suffered as a resultof the Debtor's default on the payment and performance bonds it issued as surety for the project.[2] A surety is paid to protect against the risks of contractor nonperformance. *Ohio Casualty Insurance, Co.v. United States*, 12 Cl. Ct. 590, 591 (Fed. Cl. 1987). A performance bond guarantees that the contract will be completed in the event of a contractor default and ensures that the government will not have to pay more than the contract price. *United States Surety Company v. United States*, 83 Fed. Cl. 306, 310 (Fed. Cl. 2008). The surety may satisfy its obligation under the performance bond by completing the contract itself or it may assume liability for the government's excess costs in completion of the project (reprocurement costs). *Id*.; *Weschester Fire Ins. Co. v. United States*, 52Fed. Cl. 567, 574 (Fed. Cl. 2002). Under a payment bond, a surety is responsible for paying for all labor and

---

[2]The bonds in question are required by the Miller Act, 40 U.S.C. §§ 3131-3134.

material costs in the event that a primary contractor fails to do so. *Transamerica Premier Ins. Co. v. Ober*, 894 F.Supp. 471, 475 (D. Me. 1995).

The facts show that Diamante defaulted. Diamante's default triggered the Debtor's responsibility under the bonds. The United States submitted evidence showing that, after the Debtor's default and due to its inability to seek recovery from the Debtor due to the bankruptcy, it was required to pay $717,189.06 in reprocurement costs to finish the contract. Additionally, the United States showed that unpaid subcontractor costs totaled $286,826.04. Pursuant to the performance and payment bonds, the Debtor is responsible for both the reprocurement and subcontractor costs.

However, the pertinent inquiry as to the dischargeability of the NPS debt is whether the Debtor's misrepresentations *caused* the loss to the government. *In re Osborne*, 455 B.R. 247, 252 (Bankr. M.D. Fla. 2010). Here, that causal link is present. The Debtor's Affidavit included information attesting to his ability to adequately serve as surety for the NPS contract. It stated that he owned real property, free and clear, and that his business was valuable. Without those statements, the Debtor's surety application would not have been approved. Those misrepresentations went directly to the heart of the Debtor's ability, or lack of ability, to pay in the event of a contractor default. Ultimately, the Debtor could not pay when he was required to because he lacked the financial ability to do so—he was in bankruptcy. The Debtor's misrepresentations regarding his financial ability kept the government from securing a different surety with the financial assets to protect it from losses. The Debtor argues that the contractor, Diamante, caused the losses to NPS. While it is true that Diamante defaulted, the potential for Diamante to default was precisely the reason a surety was necessary in the first place. The Debtor's inability to pay thereafter caused the loss to NPS, not Diamante's default. Thus, the

NPS' losses in the Big Bend Phase II project, as demonstrated in the proof of claim, were caused by the Debtor's misrepresentations.

## 2.

The United States also seeks to have the amounts paid for bond premiums to Sears declared nondischargeable pursuant to § 523(a)(2) as funds fraudulently obtained. The United States argues that every bond the Debtor wrote was not worth the value paid for it due to the lack of assets backing the bonds. As to the bonds, the United States has to prove all of the elements of § 523(a)(2). The fraud as to all of the bonds offered into evidence has been shown. The statements made as to the Debtor's assets were untrue. Evidence of loss has been provided. Each bond states the total amount of the bond and the Debtor testified that his premium was four percent of the total. The only bonds offered into evidence were bonds in which Sears was the surety for the winning contractor. Therefore, as to each bond, the United States suffered the loss of the premium amount. Although the exact amounts are not shown, as stated above, the Court is only determining whether a debt is nondischargeable or not and is not determining the exact amount of any amount due as a result of the fraud.

However, there was only evidence offered as to reliance as to eleven government contracts. Those contracts are: (1) GSA contracting officer Tracy Maes testified with regard to contracts GS-08P-06-JBC-3042, GS-08P-06-JBC-3077, and GS-08P-07-JB-P-0024; (2) GSA contracting officer Barbara Marthe testified in regard to contracts GS-08P-07-P-0096 and GS-08P-08-JB-0008; (3) National Park Service contracting officer Jim Read testified regarding contract N/C8380060031; (4) National Park Service contracting officer Sheri Slavens testified about contract P8750070323; (5) National Park Service contracting officer Tammy Gallegos testified regarding contract number N/C1274070054; (6) Department of Veterans Affairs

contracting officer Crystal Dobbins testified as to contract number VA-263-08-1B-0137; and (7) Carole Bryant, a National Park Service contracting officer, testified about contract number C7220080004. Reliance is a necessary element of proof under § 523(a)(2). Only the bond premiums associated with those eleven government contracts are nondischargeable debts.

### 523(a)(4)

Pursuant to § 523(a)(4), debts that are the product of larceny are excepted from discharge. Bankruptcy courts look to the federal common law definition of larceny in considering § 523(a)(4). *In re Deerey*, 371 B.R. 525, 534 (Bankr. M.D. Fla. 2007); *In re Kieswetter*, 391 B.R. 740, 748 (Bankr. W.D. Pa. 2008). Larceny is a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *Id*. Larceny requires that the fraudulent intent exist at the time of the taking. *In re Hosey*, 355 B.R. 311, 323 (Bankr. N.D. Ala. 2006); 4 Collier on Bankruptcy ¶ 523.10[2] (16th Ed. 2011).

The case of *In re Lennard*, 245 B.R. 428, 433 (Bankr. M.D. Ga. 1999), is instructive. In *Lennard*, a construction contractor received construction supplies to complete three different jobs over a period of several months from a supplier. The contractor never paid the supplier. The supplier filed materialman's liens against two of the properties where the materials were used. In order to "get further payments," the contractor executed false affidavits stating that all of the materialmen and suppliers had been paid in full. The contractor's intent with the affidavits was to destroy the supplier's lien rights. The contractor testified that he intended to pay the supplier, but that he needed to execute the false affidavits in order to keep receiving money. The contractor later filed Chapter 7 bankruptcy and the supplier filed a complaint alleging that its unpaid debts should be excepted from discharge. The Court found that the contractor had committed actual fraud for purposes of § 523(a)(2)(A) because he intentionally made a false

statement with the intent to obtain money. *Id*. at 432. However, the Court found that the contractor had not committed larceny because "at all times, he intended to pay [the supplier] for the materials." *Id*.; *see also In re Wright*, 282 B.R. 510, 517 (Bankr. M.D. Ga. 2002) (intent to pay precluded a finding of intent under § 523(a)(4)). The point made by the *Lennard* and *Wright* cases is that when a debtor intends to perform under an agreement, it weighs heavily against his/her intent to commit larceny.

In this case, the Debtor did not commit larceny. The Debtor intended to perform pursuant to the agreements. Evidence of this can be found in the Debtor's willingness to investigate and pay many of the claims made pursuant to his surety agreements. The Debtor did not possess the requisite fraudulent intent to convert or deprive the United States of property. The Debtor's fraudulent intent was limited to being approved as a surety, not to unlawfully deprive the United States of property.

## 523(a)(6)

11 U.S.C. § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Notably, the injury must be *both* willful and malicious. *In re Brock*, 186 B.R. 293, 295 (Bankr. N.D. Ga. 1995). "[A] debtor is responsible for a 'wilful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Walker*, 48 F.3d 1161, 1165 (11th Cir. 1995). "Malice can be implied when a debtor commits an act that is 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *In re Caples*, 454 B.R. 191, 203 (Bankr. N.D. Ala. 2011) (quoting *In re Thomas*, 288 Fed.Appx. 547, 549 (11th Cir. 2008)). Proof of willful or malicious injury must be by a preponderance of the evidence. *In re Alexander*, 201 B.R. 294, 297 (Bankr. N.D. Ala. 1996).

The United States alleges that the Debtor intentionally filed false affidavits that resulted in injury to the United States. Further, the United States argues that the Debtor's intentional actions were substantially certain to cause that injury. The Court has already determined that the Debtor intentionally drafted and submitted false affidavits in order to be approved as a surety for government contracts. The United States suffered losses regarding the Big Bend Phase II contract detailed above and all of the bond premiums. The applicability of § 523(a)(6) rests on whether the Debtor's actions were willful and malicious.

A.

The Court will discuss the NPS contract first. The Debtor's conduct was malicious. The evidence does not support that the Debtor held any particular animus toward the United States or the NPS. Nonetheless, filing knowingly false affidavits is a wrongful act without just cause. The point of executing affidavits under oath, as attested to by a notary, is to mandate some accountability for the affiant and provide some assurance to the receiver of the affidavit that the information contained in it is true. Executing knowingly false affidavits in order to acquire government contracts, particularly numerous times, is wrongful. Malice can be implied under such circumstances.

The Debtor's conduct was not willful. The evidence does not indicate that the Debtor intended to cause injury to the United States or the NPS. Rather, the Debtor intended, albeit through fraudulent means, to be approved as a surety. Injury was not substantially certain to occur as a result of the Debtor's intentional actions. When the Debtor fraudulently obtained the NPS contract, it was not substantially certain that the contractor Diamante would default. Thus, it was uncertain whether the NPS would be required to file a claim. Further, at that time, the evidence shows that the Debtor would have attempted to perform under the contract and cure the

default. In fact, with the benefit of hindsight, it appears that the Debtor did attempt to cure Diamante's default. The Debtor did not willful and maliciously cause injury to the United States or the NPS. Thus, discharge will not be denied pursuant to § 523(a)(6).

B.

As to the bond premiums paid by the United States, Sears' actions were malicious. He knowingly filed false affidavits which was a wrongful act without cause. However, as with the NPS contract, Sears' actions were not willful. He did not intend to cause injury. He intended to be approved as a surety and to perform the necessary actions to insure completed contracts. The evidence shows he did, in fact, step in and make sure some troubled or defaulted contracts were finished. Thus, discharge will not be denied pursuant to § 523(a)(6).

Therefore, it is ORDERED:

1. The United States is GRANTED a judgment declaring the debt nondischargeable owed to the National Park Service under NPS contract N/C1274070054, pursuant to § 523(a)(2)(A);

2. The United States is GRANTED a judgment declaring the debt nondischargeable owed to the United States for the bond premiums paid in conjunction with the following government contracts: (1) GSA contracts GS-08P-06-JBC-3042, GS-08P-06-JBC-3077, and GS-08P-07-JB-P-0024; (2) GSA contracts GS-08P-07-P-0096 and GS-08P-08-JB-0008; (3) National Park Service contract N/C8380060031; (4) National Park Service contract P8750070323; (5) National Park Service contract number N/C1274070054; (6) Department of Veterans Affairs contract number VA-263-08-1B-0137; and (7) National Park Service contract number C7220080004.

3. All other relief requested by the United States shall be DENIED, including that relief request pursuant to § 523(a)(4) and § 523(a)(6); and

4. A separate judgment, consistent with this order, shall be entered.


Dated:   February 16, 2012

*Margaret A. Mahoney*

MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE