UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

     MORRIS SEARS d/b/a ABBA BONDING,

          Debtor.                      Case No.: 09-11053-MAM-11

     UNITED STATES OF AMERICA,

          Plaintiff,

     v.                                Adv. Proc. No.: 09-01070

     MORRIS SEARS d/b/a ABBA BONDING,

          Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART THE DEBTOR'S MOTION
TO ALTER OR AMEND**

Charles Baer, Attorney for the United States, Mobile, Alabama
Kenneth A. Watson, Attorney for the Debtor, Mobile, Alabama

     This case is before the Court on the Debtor's Motion to Alter or Amend a prior Order

declaring certain debts of the United States nondischargeable. The Court has jurisdiction to hear

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District

Court. The Court has the authority to enter a final order pursuant to 28 U.S.C. § 157(b)(2). For

the reasons indicated below, the United States' requested relief is due to be GRANTED to the

extent that the Court wishes to clarify some of its factual findings and otherwise DENIED.

**FACTS**

     On February 16, 2012, this Court held that the Debtor made fraudulent representations

within Affidavits of Individual Surety that he submitted in conjunction with ten[1] bond surety

---

[1] The Court mistakenly asserted that the bond premiums related to "eleven" bond contracts were
nondischargeable in its prior opinion. In reality, the Court listed "ten" bond contracts where the

contracts (collectively, "Affidavits" or singularly, "Affidavit"). That finding served as the basis for a determination that damages stemming from those misrepresentations were nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The Debtor filed a motion to alter or amend on March 22, 2012 taking issue with some of the factual and legal conclusions detailed in the Court's previous opinion. The facts in the Court's previous opinion are incorporated here by reference. However, the Court will state more precisely several of its factual findings.

1. The Affidavits were "completely filled out" and "properly completed." For clarity, the Court will detail the contents of the Affidavits. The Affidavits are one page form documents. At the top of each Affidavit, the State and County where the Affidavit was executed is filled in followed by the social security number of the individual testifying. In the Debtor's case, the State of Alabama and Baldwin County are filled in and the Debtor's social security number (which is redacted on the Court's copies) is detailed. Below that, the following statement is included:

> I, the undersigned, being duly sworn, depose and say that I am: (1) the surety to the attached bond(s); (2) a citizen of the United States; and of full age and legally competent. I also depose and say that, concerning any stocks or bonds included in the assets listed below, that there are no restrictions on the resale of these securities pursuant to the registration provisions of Section 5 of the Securities Act of 1933. I recognize that statements contained herein concern a matter within the jurisdiction of an agency of the United States and the making of a false, fictitious or fraudulent statement may render the maker subject to prosecution under title 18, United States Code Sections 1001 and 494. **This affidavit is made to induce the United States of America to accept me as surety on the attached bond.**

---

associated bond premium would be nondischargeable. This was an oversight on the Court's part. Ten is the appropriate number. For clarity, the following ten contracts bond premiums were found to be nondischargeable: (1) GSA contracts GS-08P-06-JBC-3042, GS-08P-06-JBC-3077, GS-08P-07-JB-P-0024, GS-08P-07-P-0096, and GS-08P-08-JB-0008; (2) National Park Service contracts N/C8380060031, P8750070323, N/C1274070054, and C7220080004; and (3) Department of Veterans Affairs contract number VA-263-08-1B-0137.

(emphasis supplied).

After the statement, twelve enumerated informational boxes are included. Boxes 1 through 6 request the affiants name, home address, type and duration of occupation, name and address of employer, name and address of individual surety broker used (if any), and telephone number. The Debtor consistently included the requested information, where applicable, in those boxes. Box 7 states: "The following is a true representation of the assets I have pledged to the United States in support of the attached bond." Box 7 has two subparts. Subpart (a) says "Real Estate (*Include a legal description, street address and other identifying description; the market value; attach supporting documents including recorded lien; evidence of title and the current tax assessment of the property. For market value approach, also provide a current appraisal.*) (emphasis in original). The Debtor responded to that request by typing "Investment Real Estate Properties with clear title" followed by some combination of the following properties: (1) "Lots 5, 6, 7, & 8 Rosalia Ave. Lillian, AL—$156,000," (2) "4719 Albatross Drive Granbury, TX--$150,000," and (3) "Baton Rogue [sic], LA—$140,000." Sometimes the properties included the dollar valuation and sometimes they did not. No evidence was presented to the Court that any additional documents were included with the Affidavits in response to the parenthetical in Box 7, subpart (a). Subpart (b) of Box 7 asks the affiant to include "Assets other than real estate (*describe the assets, the details of the escrow account, and attach certified evidence thereof*) (emphasis in original). On many of the Debtor's affidavits, subpart (b) was left blank. On a few, the Debtor referred to an attached "Financial Statement" and stated "ABBA Bonding Net Worth" followed by an estimation that exceeded $120 million.

Box 8 asks the affiant to "Identify all mortgages, liens, judgements [sic], or any other encumbrances involving subject assets including real estate taxes due and payable." On every

3

Affidavit submitted by the Debtor it is typed "None at this time." Box 9 states: "Identify all bonds, including bid guarantees, for which the subject assets have been pledged within 3 years prior to the date of execution of this affidavit." The Debtor answered that request with the number "0". Below box 9 it states: "Documentation of the Pledged Asset Must be Attached." Box 10 requests the Debtor's signature. The Debtor's signature appears on every Affidavit. Box 11 seeks the "Bond and contract to which this affidavit relates." The government agency contract number is filled in on the Debtor's Affidavits. Box 12 is for notary purposes. It states "Subscribed and sworn to before me as follows" and asks for the date the oath was administered, the city and state it was administered, the name of the official administering the oath, the signature of that official, and the date their commission expires. The Debtor's Affidavits were sworn to and notarized by Jolie M. Douglas. They contain her signature and a notary stamp. Also present is ABBA Bonding's seal.

2.      It is clear to the Court that the Debtor knowingly made misrepresentations regarding collateral that he pledged in support of surety bonds. The Debtor falsely stated that he owned the pledged real estate free and clear of liens. The Debtor also falsely stated that the real estate had not been pledged to any other bond contract within the three years prior to the execution of any Affidavit. The Debtor made those misrepresentations numerous times to numerous agencies. The Debtor's intent in making those false representations regarding the collateral was to be approved as surety. Bond premiums of varying amounts were paid to the Debtor for his bonds. Those amounts were stated on the bonds.

3.      The pledged collateral was meant to act as security for the Debtor's surety bonds. It is a fact that the Affidavits request the affiant to detail assets pledged in support of the attached bond. This is so because the pledged assets give the United States property to look to in the event

4

of contractor default. Carole Bryant of the National Park Service ("NPS") testified that performance and payment bonds acted as "security for the government so that the contractor will fulfill its contract obligations" and that question 7, 8, and 9 of the Affidavits show "what the surety is pledging…as collateral for their bonds." Ms. Bryant explained that she reviewed questions 7, 8, and 9 of the Affidavits to make sure that "something [was] stated in those blocks" because they were important "for the bonds to be valid." Crystal Dobbins, a contracting officer for the Department of Veterans Affairs echoed that testimony: "The Affidavit of Individual Surety…lists what they're pledging for the bond to be valid." Barbara Marthe of General Services Administration ("GSA") stated that she "looked at the items that they were putting up as collateral" and explained that she "looked at [question] 8 and 9, particularly 9" on the Affidavit. Ms. Marthe explained that her responsibility was to make sure an Affidavit, "which showed what was being put up for the money for [the] contract," was present, signed, and sealed. Jim Read, a contracting officer for the NPS, stated that pledged assets would be important because they "ensure that the contract will be completed, as per the terms…and conditions of the contract." Sheri Slavens of the NPS stated that questions 7 and 8 of the Affidavits are important "to assure us that there is [sic] substantial assets to cover the bond."  It is clear to the Court that it was important to the contracting officers that assets were pledged within the Affidavits in support of the bonds.

4.     The contracting officers did not record any liens in favor of the government based on the bond surety agreements with the Debtor.

5.     The Court found in its previous Opinion that "Without [the Debtor's false misrepresentations in the Affidavits], the Debtor's surety application would not have been approved." That factual finding is supported by the evidence. As stated above, the contracting

officers explained that the pledged collateral in the Affidavits was important because it made the bonds valid and gave security to the United States. The contracting officers testified that they reviewed the Affidavit and made sure the informational boxes were filled in. Further, it cannot be argued that a bond surety was not necessary for the government contracts. Therefore, based on those facts, it is logical to infer that if box 7, 8, and 9 of the Affidavits had been blank, the Debtor's bonds would not have been accepted.

6.　　The Debtor's misrepresentations regarding the pledged collateral were made in sworn affidavits submitted to government agencies. The Affidavits stated that they were intended to induce the United States to accept the affiant as surety. The contracting officers who were deposed in connection with this case testified regarding the importance that the Affidavits were signed, sealed, and notarized. In fact, several of the contracting officers explained that the Affidavit was particularly important because the Debtor's bond surety application was an *individual* surety application, as opposed to a corporate surety application. Those contracting officers testified that, in their experience, individual surety applications were rare. Barbara Marthe of the GSA, a contracting officer for 10 years at the time she reviewed one of the Debtor's Affidavits, explained that 99% of the bond contracts she reviewed at that time involved corporate sureties. She explained that there is an approved list of corporate sureties that is accessible to contracting officers in making their approval decisions. The list is available through the United States Department of the Treasury. However, no such list exists for individual sureties. Therefore, Ms. Marthe explained that contracting officers rely on the Affidavits because they are "just as good as if you were doing a corporate, and you looked it up online, so that…meant the same thing." She stated that "when it's an individual surety, you always have an affidavit to prove it's legitimate." Ms. Marthe "figured [the Affidavit] was a legal document."

Sheri Slavens of the NPS and Tracy Maes of GSA echoed Ms. Marthe's testimony regarding individual sureties.

7.     The testifying contracting officers did not know that the pledged properties had been pledged multiple times. They stated that at the time the Affidavits were reviewed, it was not common for contracting officers to compare different Affidavits submitted by the same surety. They further explained that most contracting officers handle many bond contracts in any given year.

8.     In its previous opinion, this Court used the following language to describe the Debtor's misrepresentations: "financial ability," "directly to the heart of the debtor's ability, or lack of ability to pay in the event of contractor default," "qualifications to be a surety," and "ability to adequately serve as surety." The Court also held that the Debtor did not pay the NPS Big Bond Phase II claim because he lacked the financial ability to do so (because he was in bankruptcy). Upon reconsideration, the Court holds that those statements do not accurately describe the Debtor's misrepresentations and are not supported by the facts. The Debtor's misrepresentations were specifically regarding collateral that he pledged in support of his bonds. The Debtor did not testify regarding those representations. The only evidence before the Court that sheds light on the purpose of those representations was provided by the contracting officers through their testimony. The contracting officers testified that the pledged collateral was intended to serve as security for the government agencies. Indeed, they explained that the pledged collateral made the bonds valid. Therefore, the Court finds that the Debtor's misrepresentations were specifically regarding the collateral that he pledged as security for his bonds. The evidence does not support a finding that the representations spoke to the Debtor's

Case 09-01070   Doc 135   Filed 05/22/12   Entered 05/22/12 14:05:53   Desc Main
Document     Page 7 of 21

ability to pay otherwise. Consequently, the Court's findings that the Debtor's misrepresentations regarded his ability to pay are vacated.

9. The Debtor's Affidavits did not pledge collateral with a stated value that was equal to the penal sum of the bonds.

10. The Debtor chose not to testify in his defense. The Debtor offered no explanation for the false statements in his Affidavits.

11. Most of the contracting officers testified that, in their opinion, the government had suffered no loss because no claims had been made against the Debtor's bonds.

12. The Court takes judicial notice that the claims of the United States have not been paid by the Trustee.

## LAW

The Debtor makes several arguments for reconsideration by this Court. They will be addressed in turn.

### 1.

The Debtor argues that this case should be analyzed under 11 U.S.C. § 523(a)(2)(B) instead of § 523(a)(2)(A). He also argues that the Court treated this as a case under § 523(a)(2)(B) in its previous opinion. The United States explicitly chose to bring its case pursuant to § 523(a)(2)(A). The relevant statutory language states the following:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>
>>> (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*;

8

(B) use of a statement in writing—

> (i) that is materially false;
>
> (ii) *respecting the debtor's or an insider's financial condition*;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(A) and (a)(2)(B) (emphasis added). Two aspects of § 523(a)(2) warrant discussion. First, a plaintiff under § 523(a)(2)(A) need only satisfy the lesser, subjective standard of justifiable reliance as opposed to reasonable reliance, which is required by § 523(a)(2)(B). *Field v. Mans*, 516 U.S. 59 (1995). The United States would shoulder a greater burden traveling under § 523(a)(2)(B). Second, a cause of action under § 523(a)(2)(B) requires the use of a statement in writing that respects the debtor or an insider's financial condition. Section 523(a)(2)(A) specifically excepts from its coverage statements respecting a debtor or insider's financial condition.

The Debtor's argument depends on how this Court interprets the statutory term "financial condition." Financial condition is not defined in the Bankruptcy Code and courts are divided over the breadth of the term. *In re Bogdanovich*, 292 F.3d 104 (2d Cir. 2002) (detailing cases). The *Bogdanovich* court succinctly detailed the split as follows:

> In determining whether a statement relates to a debtor's financial condition, courts agree the term is not limited to formal financial statements. Two views have emerged over how to interpret the scope of § 523(a)(2)(A)'s exception. A _broad_ interpretation would include any statement that reflects the financial condition of the debtor. On the other hand, a _narrow_ interpretation would find that a statement relates to financial condition only when it provides information "as to [a debtor's] overall financial health."

9

*Id*. at 112 (internal citations omitted) (emphasis added). The 11th Circuit has not ruled on the scope of the term "financial condition."

The Bankruptcy Court for the Southern District of Florida adopted the narrow or strict view in *In re Dato*, 410 B.R. 106 (Bankr. S.D. Fla. 2009). In that case, it was alleged that the Debtor made oral misrepresentations regarding (1) the quality and likelihood of collection on a single account receivable and (2) the ownership of certain generators in order to induce the plaintiff to alter the terms of a security agreement. The bankruptcy court looked to the legislative history of § 523(a)(2)(B) and determined that § 523(a)(2)(B) was intended to address a discrete abusive lending practice and that the narrow or strict view "would limit the reach of section 523(a)(2)(B) only to instances where a borrower is presenting information intended to pass as an overall view of his financial condition, as contemplated by Congress." Applying the narrow view to the facts of the case, the bankruptcy court held that the "alleged misrepresentations are regarding a few single assets of the Debtor, and do not rise to the level of a representation of the Debtor's *overall* financial condition, as required by the strict view." Accordingly, the Court found that the representations made by the Debtor fell within the ambit of § 523(a)(2)(A). *See also In re Joelson*, 427 F.3d 700 (10th Cir. 2005) (adopting the narrow view and finding that representations regarding ownership of certain specific assets do not qualify as statements of a debtor's financial condition); *In re Belice*, 461 B.R. 564, 579 (B.A.P. 9th Cir. 2011) (adopting the narrow view and holding that "isolated representations regarding various items that might ultimately be included in a balance sheet or in a statement of net worth" do not amount to statements of financial condition).

This Court agrees with those courts adopting the narrow view of the term financial condition. Only those statements regarding a debtor or insider's *overall* financial health or net

worth, as opposed to statements regarding specific assets, qualify as statements of financial condition. The narrow view better effectuates one of the primary policies of bankruptcy to provide a fresh start to "honest but unfortunate debtor[s]," *Grogan v. Garner*, 498 U.S. 279, 287 (1991), by eliminating the circumstance where fraudulent misrepresentations are discharged in bankruptcy simply by virtue of being orally made and regarding anything that could be construed to inform any financial aspect of a debtor.

Here, the Debtor made misrepresentations regarding specific pieces of collateral. Under the narrow view, those statements are not statements regarding the Debtor's financial condition because they do not speak to the Debtor's overall financial health. Rather, they specifically address the qualities of the collateral the Debtor pledged in support of his bonds. *See In re Sansoucy*, 136 B.R. 20, 23 (Bankr. D.N.H. 1992) ("[A]n oral misrepresentation that certain collateral was free and clear of any liens [i]s actionable under 523(a)(2)(A)."). The Debtor appears to agree with the Court's analysis on this issue. In an earlier filing in this case, the Debtor stated:

> [T]he only alleged misrepresentations are the affidavits relating to the pledged collateral and whether the collateral was pledged on other bonds. Because those statements relating to the collateral are not statements "respecting the debtor's . . . financial condition" within the meaning of § 523(a)(2)(B), the Government's reliance on that subsection is misplaced. See, e.g., *In re Joelson*, 307 B.R 689 (10th Cir. 2004) ("A statement of financial condition [means] a debtor's net worth, overall financial condition or ability to generate income"). *See also In re Callaw*ay, 2006 W.L. 6589022 (N.D. Ga. 2006) at *21. Accordingly, the analysis of the Government's claim of nondischargeability must be made under § 523(a)(2)(A).

(Opposition Response Filed by Morris C. Sears, Adv. Proc. 09-01070, Doc. 53 at pp. 3-4). Thus, though the misrepresentations are written, they do not fall within § 523(a)(2)(B) and are properly adjudicated pursuant to § 523(a)(2)(A).

11

2.

The Debtor argues that the United States failed to establish that the contracting officers actually relied upon the Debtor's Affidavits. The Debtor is correct that actual reliance must be proven by a objecting creditor under § 523(a)(2)(A). *In re Johannessen*, 76 F.3d 347, 350 (11th Cir. 1996). Nonetheless, the United States satisfied that burden. All seven contracting officers who were deposed in conjunction with this case testified that they relied upon the Affidavits in approving the Debtor as bond surety. In fact, several of the contracting officers testified that affidavits of individual surety validate individual surety bonds in the same way that the Department of Treasury's list certifies corporate sureties. The contracting officers' testimony indicates that in approving the Debtor's bonds they made sure that a signed and notarized Affidavit was attached. No direct evidence was presented to the Court that the contracting officers were being untruthful. Further, the Affidavits submitted by the Debtor are form documents that state: "[t]his affidavit is made to induce the United States to accept me as a surety on the attached bond." This demonstrates the United States' reliance upon the Affidavits.

The Debtor argues that the Affidavits were incomplete and that "[o]ne simply cannot rely upon a document that is patently incomplete." To the extent that the Debtor's argument goes to the actual reliance requirement, arguments regarding whether the contracting officers should have known the falsity of the Debtor's representations speak to whether the reliance was justified, not whether there was actual reliance. *In re Spadoni*, 316 F.3d 56, 58-59 (1st Cir. 2003).

The Debtor cites *In re Pauley*, 205 B.R. 510 (Bankr. W.D. Mich. 1997), in support of his argument that the United States did not actually rely on the Affidavits. The bankruptcy court in *Pauley* determined that in the securities fraud context actual *and* justifiable reliance must be demonstrated in order to support a nondischargeability judgment pursuant to § 523(a)(2)(A). The

Case 09-01070    Doc 135    Filed 05/22/12    Entered 05/22/12 14:05:53    Desc Main
Document      Page 12 of 21

Debtor argues that *Pauley* stands for the proposition that "but for" reliance must be demonstrated in order to show actual reliance. The Debtor also cites *In re Lapic*, 2009 WL 2413262, at *36 (Bankr. D. Conn. August 4, 2009) and *In re Guillen*, 2007 WL 2009773, at *5 (Bankr. D. Conn. July, 6 2007) for the same proposition. In the context of this case, the Debtor insists that in order for the United States to prove actual reliance, it must show that but for the Debtor's representations, the Debtor's bonds would not have been accepted. While a "but for" showing could establish actual reliance, proof of actual reliance does not necessitate a "but for" showing. As stated by the Fifth Circuit:

> The "standard of actual reliance requires little of the creditor", *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 284 (11th Cir. 1995) (emphasis added); it must prove it "in fact relied upon the representations of the debtor". *Id.* at 281. Moreover, as mentioned, such reliance need not be the "but-for" cause of the issuer's actions: "It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." Restatement (Second) of Torts § 546 cmt. b (emphasis added; citation omitted).

*In re Mercer*, 246 F.3d 391, 413 (5th Cir. 2001).

The facts of this case support that the contracting officers "in fact" relied upon the sworn Affidavits.

3.

The Debtor takes issue with this Court's determination that the United States reliance was justifiable.

> To constitute justifiable reliance, "[t]he plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility."…Justifiable reliance is gauged by "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Additionally,"[i]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and

13

> intelligence from a cursory glance, or he has discovered something
> which should serve as a warning that he is being deceived, that he
> is required to make an investigation of his own."

*In re Vann*, 67 F.3d at 283 (internal citations omitted).

Justifiable reliance is a subjective standard. As noted by the *Vann* court, it considers what was actually known to an individual based on their characteristics and circumstances. The facts in this case indicate that the contracting officers who accepted the Debtor's bonds did not know that the representations in the Affidavits were false. The contracting officers testified that they rarely dealt with individual sureties. Instead, they primarily handled corporate bond sureties where they had access to the Department of Treasury's list in order to verify a potential surety. The contracting officers indicated that they checked to make sure a signed and notarized Affidavit was attached to the bonds and that the informational boxes were filled out. Several contracting officers explained that, according to their understanding, with individual sureties the presence of an executed Affidavit was just as good as finding a corporate surety's name on the Department of Treasury's list of approved sureties.

Further, the evidence shows that it was not a typical practice for contracting officers to compare different affidavits of individual surety submitted by the same affiant. It was also not common for contracting officers to inquire of other contracting officers regarding individual bond surety applicants. The fact that so many different contracting officers were deceived by the Debtor's misrepresentations supports the typicality of this practice. Moreover, the contracting officers reviewed many bonds and would not easily remember a representation in one Affidavit versus a representation in another. Therefore, it was not obvious to the contracting officers that the Debtor's Affidavits were untrue. Under the justifiable reliance standard, no investigation is

14

necessary when the falsity of the representations is not obvious. *Field v. Mans*, 516 U.S. 59, 71-72 (1995).

The Debtor argues that a creditor cannot rely on a "facially incomplete document." The Affidavits were not facially incomplete. The Affidavits contain answers to every requested question. It is true that the Affidavits require attached documentation and the evidence does not show that the requested documentation was attached. However, not one of the contracting officers testified that they took into account the parenthetical in box 7, subpart (a). This fact, coupled with the fact that the contracting officers rarely dealt with individual sureties, demonstrates that the contracting officers as a whole were subjectively unfamiliar with the parenthetical requirements detailed in box 7, subpart (a). Indeed, as the Debtor urges, none of the contracting officers required attached documentation in order to approve the Debtor's bonds. What was important to the contracting officers was that the Affidavit was attached to the bonds, that the boxes on the Affidavit were filled in, that property was pledged, and that, most significantly, it was signed and attested to by a notary.

The United States has proven justifiable reliance on the Affidavits in this case.

4.

This Court found in its previous opinion that the Debtor made false representations with the intent to deceive in the Affidavits in order to induce the United States to accept him as bond surety. The Court also found that although the Debtor investigated and paid many of its obligations under the bond surety agreements, those actions did not negate his fraudulent intent. The Debtor urges this Court to reconsider its ruling that subsequent performance or payments negates circumstantial intent to defraud.

15

The fraudulent intent inquiry is necessarily factual and requires "the Court to examine the totality of the circumstances." *In re Dennis*, 444 B.R. 210, 216 (Bankr. N.D. Ala. 2011). As such, a debtor's subsequent performance under the terms of an agreement alleged to be fraudulently entered can be probative as to a debtor's intent in entering the agreement. For instance, in *In re Hilley*, 124 Fed. Appx. 81, 83 (3rd Cir. 2005), a case relied upon by the Debtor, the Court considered a § 523(a)(2)(A) complaint based upon an alleged *implied* misrepresentation. In that case, the debtor entered into a loan agreement. A few months later, the debtor's wife resigned from her job and the debtor, due to the reduced funds, was unable to make the loan payments. As a result, the debtor filed bankruptcy. The plaintiff asserted, in part, that the debtor had impliedly misrepresented that he would repay the loan. The court found that although the plaintiff had stated a viable claim, the plaintiff had not proven by a preponderance of the evidence that the debtor had the requisite intent not to repay the loan. Notably, the court considered that the debtor "had made all of his monthly installment payments prior to filing for bankruptcy" in making its decision.

In this case, unlike in *Hilley*, the evidence shows that the Debtor intentionally made misrepresentations numerous times in order to be approved as bond surety. No implied misrepresentations are present here. In *Hilley*, there was some question as to the truth or falsity of the debtor's representation that he would repay the loan. Here, the misrepresentations were patently false and stated in sworn documents. Moreover, the Debtor has not offered any evidence contesting the falsity of the representations or provided an explanation as to why he made false representations. The Debtor does not argue that he mistakenly made untrue statements under oath. Indeed, such an argument would be hard to believe given the number of times that the Debtor submitted different Affidavits containing the same misrepresentations.

16

Further, the Debtor's argument that performing under the agreement negates other evidence of his fraudulent intent misconstrues the issue. The Debtor's goal was to be approved as bond surety, and he made misrepresentations in order to achieve that goal. The Debtor did not make misrepresentations regarding whether he intended to perform under the agreement. Whether or not the Debtor performed pursuant to the surety agreements after fraudulently obtaining the bond contracts is not relevant to the Debtor's deception in being approved as bond surety.

The Debtor's argument was addressed in *In re Demarest*, 176 B.R. 917 (Bankr. W.D. Wash. 1995). There, the debtors entered into a sale agreement of their home, which was encumbered by a deed of trust. The agreement required the home to be free of encumbrances. The deed of trust was supposed to be satisfied at closing, but, through an oversight, was not. The debtors became aware of the error, but did not mention it and received the proceeds of the sale that included the sale price and the money that was intended to pay off the deed of trust. The debtors used the additional money for various business purposes, but continued to pay the lender who held the deed of trust. Eventually, the deed of trust lender filed a foreclosure action on the property. The buyer of the property paid off the deed of trust lender in exchange for an assignment of the deed of trust and note and sued the debtors. The debtors filed for Chapter 7 bankruptcy protection and the buyer filed a § 523(a)(2)(A) action regarding the debt. The debtors argued that because they intended to pay back the money they kept, and made some payments, they lacked the requisite fraudulent intent. The bankruptcy court disagreed, stating the following:

> The issue…is not whether the debtors intended to pay back the money. The tacit representation to [the buyer] was that all encumbrances were being satisfied out of closing, and that the debtors were delivering clear title to property. Based on this representation, the debtors acquired approximately $65,000 which they would not have otherwise obtained. The situation is analogous

> to one in which a debtor has obtained an extension of credit by false pretenses. The intent issue thus revolves around the procurement of the funds, not the intent to repay or not to repay.

*Demarest*, 176 B.R. at 920.

It is clear to the Court that the Debtor submitted multiple Affidavits, under oath, containing misrepresentations. It is also clear that the Debtor knew that the information in the Affidavits was false. The Debtor's intent to deceive the United States can be inferred from the volume and pattern of his misrepresentations. *In re Firestone*, 26 B.R. 706, 717 (Bankr. S.D. Fla. 1982); *In re Dennis*, 444 B.R. at 216. It is not necessary to prove that the Debtor intended to cause the United States losses. *In re Spicer*, 155 B.R. 795, 802 (Bankr. D. Col. 1993). Rather, all that is required is a showing of intent to induce the creditor to rely on misrepresentations made by the debtor in question. *In re Reuter*, 427 B.R. 727, 753 (Bankr. W.D. Mo. 2010). The Court is satisfied that the Debtor made misrepresentations with the intent to deceive and the Debtor's subsequent actions with regard to the bond contracts do not negate that intent.

5.

The Debtor argues that the United States suffered no actual loss that was proximately caused by the Debtor's misrepresentations. In its previous opinion, the Court found that the United States had suffered two categories of damage as a result of the Debtor's misrepresentations: (1) the bond premiums actually paid by the United States for the Debtor's bonds associated with ten different bond contracts and (2) a $1,055,724.10 claim made by the National Park Service ("NPS") with regard to the Big Bend Phase II project in which the Debtor issued bonds as surety.

11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt for money to the extent that it is obtained by fraud. *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998). Stated differently, "[t]he dischargeability provision applies to all debts that 'arise out of' fraud." *Archer v. Warner*, 538

18

U.S. 314, 321 (2003). Court's in the 11th Circuit require proof of the following elements to except a debt from discharge pursuant to § 523(a)(2)(A): (1) the debtor made a false representation with the intent to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998); *In re Johannessen*, 76 F.3d 347, 250 (11 Cir. 1996); *In re Garrett*, 2011 WL 3586178, at *2 (S.D. Ala. August 16, 2011). Those elements must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 287, 291 (1991). Notably, the loss requirement does not use the legal term "proximate cause" employed by the Debtor and by the courts from other jurisdictions that he relies upon. Nonetheless, it is clear that a causal link must be present and that loss must be shown. *In re Vermilio*, 457 B.R. 863, 870 (Bankr. M.D. Fla. 2011) (citing *Lightner v. Lohn*, 274 B.R. 545, 550 (M.D. Fla. 2002) (requiring "proximate cause")).

Courts take an expansive view of the debts that are considered nondischargeable by virtue of being obtained by fraud or false representations. *Cohen*, 523 U.S. at 221 ("The most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any debt' respecting 'money, property, services, or an extension, renewal, or financing of credit to the extent obtained by…false pretenses, a false representation, or actual fraud.'"). This is so because "the malefic debtor may not hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct." *In re Bilzerian*, 153 F.3d 1278, 1282 (11th Cir. 1998) (quoting *In re St. Laurent*, 991 F.2d 672, 680 (11th Cir. 1993)). That policy is well-stated by the Supreme Court in *Grogan v. Garner*,

> Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the

> applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud.

498 U.S. at 287. Stated another way, "Congress intended § 523(a)(2) to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." *In re Rountree*, 478 F.3d 215, 219-220 (4th Cir. 2007).

As to the bond premiums, the United States has demonstrated that it was damaged as a result of the Debtor's misrepresentations. The Debtor pledged property to the United States in support of his bonds. He misrepresented to the United States that the property was free and clear of liens and that it had not been pledged to other projects within the previous three years. Based upon those representations, the United States paid bond premiums of various amounts to the Debtor. As evidence, the United States presented the Debtor's bonds which recite the amount of the bond premium paid on each bond. In effect, the United States paid for worthless bonds that were not backed by the stated collateral. The reason the United States paid for those worthless bonds was because of the Debtor's misrepresentations. The Debtor *obtained* money from the United States by fraud, and the United States was damaged in the amount it paid for the bond premiums. However, because reliance must also be shown, only those bond contracts where the United States presented evidence of reliance will result in nondischargeable debts. Those bond contracts are detailed in the Court's previous opinion and judgment. Further, this result is in line with the United States Supreme Court's interpretation of § 523(a)(2)(A) in *Cohen v. De La Cruz*, 523 U.S. at 224, where it held that not only was money actually obtained through fraud nondischargeable, but that punitive damage awards included in judgments based upon that fraud were nondischargeable as well as arising out of that fraud.

As to the NPS claim regarding the Big Bend Phase II project, the United States has shown that it suffered damage as a result of the Debtor's misrepresentations. In its previous

20

opinion, the Court erroneously relied upon its finding that the Debtor had misrepresented its ability to pay in making its determination that the NPS debt was nondischargeable. Upon reconsideration, the Court finds that the Debtor's misrepresentations were not about the Debtor's ability to pay, but rather, were specifically about collateral he pledged in support of his bonds. However, that fact does not change the result. The Debtor pledged collateral in support of the bonds that the NPS accepted for the Big Bend Phase II project. When Diamante defaulted as contractor, the United States was required to pay all the costs associated with finishing the job. The United States proof of claim is evidence of those amounts. To date, the United States has not been paid those amounts by the bankruptcy Trustee. If the Debtor had not filed bankruptcy, the United States could have looked to the pledged property to satisfy their losses. This is a sufficient causal link for § 523(a)(2)(A) purposes. It is of no moment that the reason that the United States could not make a claim against the properties was because the Debtor was in bankruptcy. This is merely a convenient shield of the Debtor's own making that will not absolve his fraud.

Therefore, IT IS ORDERED

1. The Debtor's motion to vacate or amend is GRANTED with regard to the factual findings specifically vacated in this opinion.

2. The Debtor's motion to vacate or amend is DENIED in all other respects and the judgment of nondischargeability detailed in this Court's previous opinion and judgment stand.

Dated: May 22, 2012

*Margaret A. Mahoney*
MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE